[Civ. No. 29506. Second Dist., Div. Four. Jan. 27, 1967.]

JOSEPH W. FAIRFIELD, Plaintiff and Respondent, v. EVERT L. HAGAN, Defendant and Appellant.

---

Jesse A. Hamilton for Defendant and Appellant.

Joseph W. Fairfield, in pro. per., and Ethelyn F. Black for Plaintiff and Respondent.

FOX, J.*—Plaintiff's first cause of action is for damages for libel.[1] The third cause of action is on the theory of malicious prosecution. The court awarded plaintiff damages as follows: On the first cause of action $1.00 general damages, and $500 punitive damages; on the third $525 general damages and $500 punitive damages. Defendant has appealed.[2]

In May 1951, Flintridge Heights, Inc., a California corporation, was adjudged a bankrupt in the United States District Court. Plaintiff was appointed attorney for the original

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] A demurrer was sustained to the second cause of action without leave to amend. In it plaintiff sought damages for abuse of process.

[2] The decision on a former appeal in this action is reported in 206 Cal.App.2d 594 [24 Cal.Rptr. 73] (*Fairfield* v. *Hamilton*).

trustee in this proceeding and later reappointed attorney for a successor trustee. The principal asset of the bankrupt estate was a tract of undeveloped property comprising approximately 60 acres, located in Flintridge in Los Angeles County, and described as tract 14269.

In 1956, Hagan obtained a judgment against Flintridge Highlands, Inc., levied execution on tract 14269 and obtained a marshal's deed under an execution sale. Claiming that he was the owner of this tract, Hagan filed suits in both the federal and superior courts to quiet title to said property and alleging that defendants, including the trustee in bankruptcy, claimed an interest therein. He did not, however, obtain consent of the referee in bankruptcy (as he should have) to make the trustee a party. Citation of Hagan and his attorney for contempt followed. The quiet title actions were dismissed. In June 1957, Hagan filed a document with the referee in bankruptcy demanding that the trustee in bankruptcy convey the tract in question to him. Fairfield, as attorney for the trustee, opposed this move as he had the quiet title actions in the state and federal courts. It is out of the struggle to acquire this tract of land and the administration of the bankrupt estate that this lawsuit has its genesis.

Although Hagan was not a creditor of the bankrupt estate, he sent a letter to the creditors thereof, dated July 9, 1957, and another (undated) sometime after a meeting of the creditors on July 15, dealing with the administration of the bankrupt estate and commenting on Fairfield's activities therein. These letters, exhibits 2 and 3, form the basis of plaintiff's libel action. They are set out in full in the margin.[3]

---

[3]Exhibit 2 reads: "This letter is addressed to you, a creditor of the Bankrupt estate of Flintridge Inc. and is to advise you of certain conditions concerning which your investigation might be advisable and profitable.

"The writer of this letter is not a creditor. I took a certificate to the acreage owned by the above bankrupt estate at a Marshals sale out of execution and subject to the trust deed held by the estate and I undertook to find out the status of the finances but have not been very successful. What has happened to certain proceeds of sales and other monies that have been received I could not determine and apparently you and other creditors should demand an accounting.

"It is possible that many thousands of dollars are being wasted in useless attorney representations and other unnecessary expenses. We are aware some attorneys like to continue these matters for the purpose of their making a bigger fee.

"I suggest that you particularly check Mr. Fairfield who has apparently represented the estate to date and the amount he has received for services, much of which appear of a character that has accomplished

The trial court found, *inter alia*, that "Exhibits 2 and 3 were false, unprivileged and defamatory communications and

nothing for the creditors and may have consumed much of the monies that have been received that should have gone to the payment of the indebtness due you and others. Should this be found true, then an attorney who has the best interest of the creditors in mind should be secured at once to replace Mr. Fairfield.

"Also, should it be found that the former trustee now deceased has not properly has not properly handled the proceeds of the assets of the estate then the bonding company protecting the creditors should be asked to reimburse them. As to what the claim if any, the creditors might have, I have been unable to ascertain but proper accounting should disclose this and this, any creditor has a right to demand.

"I might further advise that the sale made by the trustee and the acceptance of a trust deed appears to be a most unbusinesslike affair. It was most rediculous to permit 16 lots and 1.7 acres of the best area of the property to be taken away from the tract, and worst, this was spotted all over the acreage instead of being in one piece. As a consequence, the entire acreage has been greatly damaged by a Mr. Anderson now owning scattered parcels all over the tract. Making it impossible for a developer to properly improve the balance.

"Also, at the foreclosure of this trust deed by the trustees presumably handled by Mr. Fairfield, it appears a very serious mistake was made in only bidding at the sale $25,000, whereas the trust deed was $98,000. A result of this looks like the creditors have lost some $77,000 as no asset had been found to collect from since this amount has been taken in a defiency judgment personally against the purchasers and they have nothing. And as a defiency cannot again be returned as against the security of the acreage, the entire amount appears to be lost to the creditors.

"As you are aware, this matter has been pending some 7 years which is most rediculous and there appears to be no acceptable explanation.

"It appears Mr. Fairfield has made numerous appearances that accomplished nothing for the estate of the creditors. I have not been able to find what charges he has made but the creditors can demand that information and should it be excessive, it is possible that they have a claim against the bonding company insuring the trustee.

"My information is that there is only some $800 in the estate, whereas it appears $30,000 to $50,000 has been received of which $18,000 was used to pay off a mortgage, but could not find out what has been done with most of the balance.

"For your further information I might add that I have recently tendered the referee $27,000, an amount under the right to redeem. This greatly reduced amount than that which should have been due was because the original amount against the security was reduced by taking of the defiency judgment which either the trustee or Mr. Fairfield elected to do and look like this $77,000 has now been lost to the creditors by the conduct of one of the above parties and the use of very poor judgement. Should the trustee be responsible under his bond, is something that should be looked into and also what part the attorney for the trustee may have had in causing this loss and his responsibility.

"Your should be present on the 15th at 10 o'clock and as a creditor demand that this estate be closed and the available proceeds distributed. Otherwise, it is my opinion that everything is going to be lost by more Attorneys fees should all this continue for years. Also, you should see that a trustee is appointed who will properly represent the creditors and sincerely attempt to retrieve for them whatever is left of the estate which does not now appear to be too much. Also at the same time, you should demand a full investigation and accounting of the past conduct of the trustee and attorney representing him or Mr. Fairfield.

are libelous per se. That the libelous publication of Exhibits 2 and 3 injured the plaintiff personally'' and awarded plaintiff $1.00 general damages. The court further found that the publication of exhibits 2 and 3 by defendant ''was done maliciously and motivated because of his ill will and hatred towards the plaintiff'' and awarded plaintiff exemplary damages of $500. The court also found that the defense of truth to the first cause of action was not true, and that the publication of exhibits 1 and 2 was not privileged.

We come now to the question whether exhibits 2 and 3 are libelous per se.

Section 45 of the Civil Code defines ''libel'' as ''a false and unprivileged publication by writing, printing, picture,

''Certainly, the trustees bond should be raised to reasonably conform to the assets of the estate.

''If you care to have any additional information I might have in my possession, which is a very considerably amount, you may either write or phone me and I shall try to be helpful.

''Yours very truly,
''Evert Hagan''

Exhibit 3 reads:
''CREDITORS OF FLINTRIDGE HEIGHTS INC.:

''At the creditors meeting July 15, a new trustee was appointed for the bankrupt estate of Flintridge Heights, Inc. But in my opinion to the determent of all the creditors attorney Joseph Fairfield continues to represent this new trustee. My reason for making this statement is that I consider him responsible for the long delay in the settlement of this estate, the failure to distribute the assets to the creditors, and the loss of a great part of these assets by what must be considered carelessness and improper handling of the affairs of the estate. I may be wrong in these conclusions but the opinion I offer is sincere and based upon considerable investigation.

''As expressed in my former letter to the creditors, I myself an mot one and my only interest is that I own a certificate of sale out of a marshall's execution sale to this tract, and I have for approximately a year extended a diligent and expensive effort to find a buyer for the tract in order to conclude the affairs of this estate. But Mr. Fairfield was in control and was 'sitting in the driver's seat,' though the trustee should have been. From him I have received no cooperation of any nature, but rather interference as against the best interests of the estate as well as myself, and my efforts to find some one to make a substantial offer for the property. Possibly this could be for the reason that it would interfere with a 'career' in the representation of the estate which has now continued for seven years, a situation which, I believe, is without precident.

''I admit that there are personal matters between myself and Mr. Fairfield. Just recently he took up my time by having me cited for contempt of court because I filed an action in the U.S. District Court to try and get this matter terminated. In this order to show cause, he was entirely incorrect as I have noticed that he has been in most important matters concerning this estate. The using up of the creditors assets to try and put people in jail appears to have continued over a long period, whereas this should be a matter for the district attorney at the expense of the tax-payers rather than the few creditors of this estate.

''It appears that there will be very little or nothing left in this estate

effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Libel per se is defined as "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as inducement, innuendo, or other extrinsic fact. . . ." (Civ. Code, § 45a.) "A defendant is liable for what is insinuated, as well as for what is stated explicitly." (*Bates* v. *Campbell,* 213 Cal. 438, 442 [2 P.2d 383].) It is clear from a reading of section 45a that "language may be libelous on its face even though it may also be susceptible of an innocent interpretation. The test is whether a defamatory meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts. If it does, 'whether the charge be directly made or merely implied, the publication—without *averment, colloquium,* or *innuendo*—will, in itself, constitute a libel.' " (Italics by the court.) (*MacLeod* v. *Tribune Publishing Co.,* 52 Cal.2d 536, 549 [343 P.2d 36].) The *MacLeod* court went on to say (p. 549) that "The fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. The language used

for the creditors should the Fairfield program be permitted to continue. Though, if it had been properly handled, there would have been ample assets to have *paid all creditors in full.* But the way matters have been handled, particularly selling the sixteen scattered lots which was most unbusinesslike with no apparent effort to protect creditors presents a situation where certainly someone should be held responsible.

"I would possibly be interested in acquiring some of the creditors claims in this estate should I not be required to outlay any large sums of money because I do not consider there is much left.

"Should you have an interest that you should care to dispose of, I might be interested in obtaining it from you for a cash consideration as I am not in a position as a creditor at the present time, so I do not have the present rights to undertake to enter this controversy and straighten out and terminate this matter.

"I hope that you will not assume that I am butting into your affairs by addressing you this letter a second time but someone should strenuously object to the Fairfield program.

"May I not hear from you either by phone or letter?

"Yours very sincerely,
"Evert Hagen

"P.S. Since writing my last letter, Fairfield, the attorney representing you creditors, has filed a memorandum in support of his position which is also in support of the attorney for the defendant Naylor who seeks to have a deficiency judgment in the amount of $77,000.00 in favor of the estate set aside. It is difficult to understand how he can take such a position. I would be happy to send you a brief in reply as well as the memo."

may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that at least some of the readers will take it in its defamatory sense.'' This principle was quoted with approval in *Maidman* v. *Jewish Publications, Inc.*, 54 Cal.2d 643, 651 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]. The *Maidman* case also quoted with approval the following from *Bates* v. *Campbell, supra,* 213 Cal. 438, 441: '' 'The code definition of libel is very broad and has been held to include almost any language which, upon its face, has a natural tendency to injure a person's reputation, either generally, or with respect to his occupation.' '' (P. 649.) Furthermore, ''the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.'' (*MacLeod* v. *Tribune Publishing Co., supra,* 52 Cal.2d 536, 547.)

Applying these principles, it is clear the court correctly held that exhibits 2 and 3 are libelous per se. From these exhibits the average reader could readily get the impression that plaintiff was "milking" the bankrupt estate, that he had charged and received fees to which he was not entitled because he had done little or no work, that plaintiff's acts and conduct in relation to the bankrupt estate were responsible for its impoverished condition, and that if plaintiff were permitted to continue as attorney for the bankrupt estate, the creditors would receive little or nothing. Such charges had a natural tendency to injure plaintiff's general reputation.[4]

Does the evidence support the finding that the publication of exhibits 2 and 3 was done ''maliciously and motivated because of his ill will and hatred'' against plaintiff? Here we have a question of fact. We must indulge every inference that reasonably may be drawn in support of the finding. Also there is a presumption that the finding is supported by the evidence. (*Jeffers* v. *Screen Extras Guild, Inc.*, 162 Cal.App.2d 717, 731 [328 P.2d 1030].) Therefore, we shall examine by way of illustration only a few incidents that have a bearing on the question of malice. We may properly start with the fact that, in December 1956, Hagan obtained a judgment against Flintridge Highlands, levied execution on tract 14269, and obtained a marshal's

---

[4]By reason of plaintiff's failure to allege a good professional reputation, damages to his professional reputation are not involved in this action.

deed under execution sale. Soon thereafter he began a campaign to perfect his title to this property. In February 1957 he filed a quiet title action in the superior court to quiet title to this tract. He named the trustee in bankruptcy as a defendant, but without getting the consent, which was required, of the referee. Plaintiff frustrated this move. Hagan had to dismiss this suit. In May 1957, Hagan filed a quiet title action in the federal court involving this property and again named the trustee a defendant without getting the referee's consent. Plaintiff again frustrated his efforts and he had to dismiss that suit. On June 27, 1957, Hagan filed a document with the referee in bankruptcy, and demanded that the trustee convey tract 14269 to him. Plaintiff again frustrated Hagan's move. It is a reasonable inference that Hagan, having been prevented three times by Fairfield from getting the property in question became angered at him, and decided it would be to his interest in getting this property to get Fairfield removed as attorney for the trustee, and that he fell upon the plan of writing the creditors of the bankrupt estate (exhibit 2, dated July 9, 1957 and exhibit 3, undated but after July 15, 1957) in the hope that they would become alarmed and cause Fairfield's removal as attorney for the trustee. Thus, he would not be interfered with further by Fairfield in his efforts to get this piece of property.

It will be recalled that orders to show cause re contempt were issued against Hagan and his attorney for naming the trustee in bankruptcy a defendant in the quiet title actions, that they proclaimed their unfamiliarity with this rule, and that Fairfield as attorney for the trustee consented to the discharge of the orders to show cause, whereupon the referee dismissed the same. Yet, despite the fact that plaintiff consented to the discharge of the order to show cause because of Hagan's ignorance of the rule in question, nevertheless Hagan commenced an action for malicious prosecution against Fairfield in the Los Angeles Municipal Court (No. 463178). This action was filed on July 20, 1957. After a trial upon the merits, the case terminated in favor of Fairfield. The court found this action was commenced by Hagan against Fairfield "maliciously and without probable cause." It is significant that this action was filed eleven days following the date of exhibit 2.

On or about April 27, 1959, Hagan and Charles M. Farrington (identified as an employee of Hagan during some of the times herein) "designating themselves as informants, filed a

document with the Supreme Court of the State of California, entitled 'Verified Information Submitted to the Court under Section 6101 et seq. of the Business and Professions Code' asking the Supreme Court of the State of California to investigate the professional conduct of Joseph W. Fairfield." On June 24, 1959, an order was entered denying the petition. It is difficult to think of any action one could take which would more definitely emphasize his hatred against the person who is the subject of such a petition.

Truth, of course, is a defense to an asserted libel. Being an affirmative defense the burden is on the defendant to establish it. The trial court held that defendant did not sustain his plea of truth. The record warrants this finding. But, argues defendant, the trial court by its erroneous rulings prevented him from establishing this defense. We shall examine these rulings. The first relates to the admissibility in evidence of Fairfield's petition for fees in the bankruptcy proceeding.[5] The objection was that this petition was irrelevant and immaterial. It was sustained. The court pointed out that the fees that are asked by an attorney may be very different from those that are allowed; that practically every attorney has had the experience of asking for larger fees than were awarded. In response to defendant's suggestion that he was entitled to show the fees that Fairfield received, the court pointed out that Fairfield "couldn't get a dollar unless it was approved by the Referee"; that he had to make a showing that he was entitled to it or he couldn't get it; and that the presumption is that the referee's "official duty was properly performed." Further, that if anyone was dissatisfied with the order of the referee allowing attorney's fees, they had a right to have the matter reviewed by the United States District Court and then by the Circuit Court of Appeals. In view of the required procedure in the premises and the presumption that official duty was properly performed, the position of the trial court was sound.

The second ruling about which defendant complains is the court's refusal to permit him to explore the litigation between the trustee (who was represented by Fairfield) and Harvey Construction Company. The court's reasoning was essentially the same as that considered in the preceding paragraph, viz., that before any funds could be expended in this litigation, the approval of the referee was essential, and that it must be

---

[5] Exhibits 2 and 3 were published in July 1957; Fairfield's petition for fees was submitted in August 1958—some 13 months later.

presumed that "his official duty was properly performed." We find no error in this ruling.

The third ruling about which defendant complains is that the court refused to admit evidence of an alleged surreptitious arrangement between Fairfield (while he was representing the trustee) and one Soskin by which the latter would purchase the bankrupt's interest in the Flintridge tract for $30,000, then they would sell it for $100,000 and split the profit.[6] The trial court sustained the objection on the ground that the proffered testimony did not tend to prove the truth of any of the statements made by defendant in exhibits 2 and 3. The court was plainly correct in this ruling.

Defendant argues in vain that the court erred in finding that conditional privilege did not exist. ▆ Unquestionably conditional privilege is a defense to an action for libel. (Civ. Code, § 47, subd. 3.)[7] But the burden is on the defendant to both plead and prove conditional privilege. In *Morcom v. San Francisco Shopping News*, 4 Cal.App.2d 284, the court stated at page 288 [40 P.2d 940] : "Ordinarily the question of privilege is a matter of defense. [Citation.] The burden is on the defendant to allege and prove, primarily, the privileged character of the publication, including the absence of malice. [Citations.] " ▆ Not only did defendant fail to prove that conditional privilege for the publication of exhibits 2 and 3 existed, but the record indicates that conditional privilege did not exist. Defendant did not have an interest in common with the creditors of the bankrupt estate to warrant his unsolicited communication to them. On the contrary, his interest was adverse to that of the creditors. The purpose of his communications, exhibits 2 and 3, was not to aid the creditors in obtaining the best price for the property but to induce them to take steps which would enable him to acquire

---

[6]Since we are authorized to take judicial notice of the record in this case on the former appeal (*Barker* v. *Carver*, 144 Cal.App.2d 487 [301 P.2d 307]), we have examined it, and particularly the testimony of the referee who was in charge of the bankruptcy proceedings involving Flintridge Heights, Inc. The referee testified that when the Soskin story was related to him, he ordered a hearing on the charges, and "I found the charges were not supported." (Rep. Tr. pp. 538-39, *Fairfield* v. *Hamilton*, 206 Cal.App.2d 594 [24 Cal.Rptr. 73].)

[7]"A privileged publication or broadcast is one made—

" . . . . . . . . .

"3. In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

the property at an advantageous price. Moreover, the publication of exhibits 2 and 3 was activated by malice as we have heretofore shown. Such being the case, the defense of conditional privilege under Civil Code section 47, subdivision 3, is not available. In *Morcom* the court pointed out, at page 288: "But, in order that the privilege accorded by subdivision 3 of section 47 of the Civil Code, be available, it must appear that the publication was made without malice. If it is made to appear that the defendant acted with malicious intent, in uttering the libel, it cannot successfully invoke the protection of this privilege."

When the court held that plaintiff's second cause of action for damages for abuse of process did not state a cause of action, permission was granted plaintiff to file an amended complaint. He filed his third amended complaint by simply adding a third cause of action on the theory of damages for malicious prosecution. In it he essentially made the same allegations that he had previously made in his second cause of action, *e.g.*, his first paragraph of his third cause of action is based on an action for malicious prosecution filed by Hagan against Fairfield in the Los Angeles Municipal Court on July 20, 1957. This had been item one in his previous second cause of action. Plaintiff's second item in his third cause of action is based on an action for malicious prosecution filed by Hagan against Fairfield in the superior court on June 16, 1958, and is based on paragraph five of his previous second cause of action. This third amended complaint which included count three for the first time was filed in June 1964. The original complaint was filed in July 1958. Defendant argues that, since a cause of action for malicious prosecution is different from that of abuse of process, the amendment, viz., the third cause of action in the third amended complaint, should not have been permitted because the statute of limitations had run. In permitting amendments after the statute of limitations has run, the question is not whether they state different causes of action, but whether they arise out of the same transaction. The principle is stated in *Wennerholm* v. *Stanford University School of Medicine,* 20 Cal.2d 713 at page 718 [128 P.2d 522, 141 A.L.R. 1358] : "The modern rule, where amendment is sought after the statute of limitations has run, is that the amended complaint will be deemed filed as of the date of the original complaint so long as recovery is sought in each complaint upon the same general set of facts. [Citations.] A mere

change in legal theory will not subject the amended complaint to the bar of the statute of limitations. [Citations.]''

The principle is stated in *Weinstock* v. *Eissler*, 224 Cal. App.2d 212, at page 234 [36 Cal.Rptr. 537], in this language: ''Where an amended complaint, filed after the statute of limitations has run, seeks recovery on the same general set of facts as in the original complaint, it will relate back to and be deemed filed as of the date of the original complaint and a mere change in the legal theory underlying the complaint will not subject the amended complaint to the bar of the statute of limitations.''

■ Since both causes of action arose out of the same facts, it was not an abuse of discretion to permit the third cause of action to be added in the third amended complaint for it was not barred by the statute of limitations.

■ There is no merit in defendant's point that plaintiff waived his rights to a cause of action based on the theory of malicious prosecution and thereby made an election of remedies. ''Waiver is an affirmative defense that must be pleaded with specificity and separately stated. In pleading waiver the defendant must set forth the facts upon which he bases his claim of waiver.'' (*Meyer Koulish Co.* v. *Cannon*, 213 Cal. App.2d 419, 432 [28 Cal.Rptr. 757].) There is no plea of waiver by defendant in this case.

The doctrine of election of remedies is not here applicable. The second cause of action in the third amended complaint and the third cause of action in that complaint, as we have pointed out, are based on the same facts. The difference is simply in the legal theory upon which plaintiff relies for recovery. There is but one form of action in this state, and a plaintiff may not be denied relief merely because he is mistaken as to the theory upon which he is entitled to relief.

With respect to the third cause of action, the court found that both of the cases referred to in paragraphs 1 and 2 of said cause of action were commenced by Hagan against Fairfield maliciously and without probable cause and that these actions terminated in favor of plaintiff herein. Defendant argues that the court erred in holding that want of probable cause was established.

The case that Hagan filed against Fairfield in the municipal court of Los Angeles seeking damages for malicious prosecution, referred to in paragraph 1 of the third cause of action, has been discussed earlier in this opinion with respect to the element of malice. ■ Our consideration here of that case

will be limited to the sufficiency of the evidence to sustain the finding that Hagan did not have probable cause for filing that municipal court action. It will be recalled that two actions were filed by Hagan to quiet title to tract 14269, in which he named the trustee in bankruptcy a defendant in each action but had not obtained the consent of the referee for such purpose. Fairfield advised the attorney for Hagan that failure to obtain the consent of the referee in bankruptcy to make the trustee a party to the action was contemptuous and suggested that he dismiss both of these actions against the trustee. When he refused to dismiss these actions, both Hagan and his attorney were served with orders to show cause why they should not be cited to the United States District Court for contempt of court. On the return date of the order to show cause, both Hagan and his attorney stated that they were unaware of the fact that the consent of the referee was required before an action could be commenced against the trustee in bankruptcy. Thereupon, Fairfield consented to a dismissal of the order to show cause and the referee did dismiss the said order. In view of the fact that Fairfield consented that the order to show cause citing Hagan for contempt of court be dismissed because of his lack of knowledge that he must have the consent of the referee in order to make the trustee a party to these actions to quiet title, there does not appear any reasonable basis for Hagan to subsequently commence an action for malicious prosecution against plaintiff growing out of this order to show cause matter.

The cause of action set forth in paragraph 2 of the third cause of action in the superior court (No. 703001) for malicious prosecution grew out of the circulation of exhibits 2 and 3. It was filed by Hagan against Gardner, who was the trustee in bankruptcy, and Fairfield who was attorney for the trustee. Gardner, the trustee, it seems, was never served.

In August 1957 a petition was filed against Hagan to show cause why he should not be held in contempt of court arising out of the publication of exhibits 2 and 3 on the theory that the publication of these documents to the creditors of the bankrupt estate was an unlawful interference with the administration of that estate. An order to show cause was issued and returnable in the following September. Nothing happened with respect to the order to show cause for about a year. In the meantime tract 14269 was purchased by one Herman Lenz who had been produced as a potential purchaser by Hagan. The question of Hagan's alleged contempt there-

fore appeared to be moot and that no useful purpose would be served in pursuing the order to show cause. No hearing was held on it, and Hagan was not cited to the district court. It was simply dismissed by the referee. Both of the malicious prosecution suits terminated in favor of Fairfield. The circumstances out of which these two malicious prosecution actions developed and the fact that shortly before they were filed Fairfield had upon three separate occasions, as previously pointed out, frustrated Hagan's efforts to acquire tract 14269 and the fact that Hagan had maliciously published exhibits 2 and 3, justified the trial court in finding that these two actions were filed without probable cause.

Finally, defendant charges bias and prejudice on the part of the trial judge. He has referred to a number of incidents in the transcript which he claims support his charge. We have examined each of them in the context of the particular phase of the matter that was at the moment before the trial court and have concluded that none of these instances, nor all of them taken together, justify the charge of bias and prejudice against the court. We do not believe that any useful purpose could be served in discussing in detail these charges against the judge.

The judgment is affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied February 16, 1967